1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS E. THREATS,<br><br>Petitioner,<br><br>vs.<br><br>MATTHEW CATE,  Secretary, et al.,<br>Respondents. | Civil No.    09cv0816 IEG (AJB)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

Marcus Threats ("Petitioner"), a state prisoner proceeding pro se, has filed a First Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego County Superior Court conviction in case number SCN188678.  (Doc. No. 4.)  Petitioner was convicted of assault by means of force likely to produce great bodily injury, assault with intent to commit rape, second degree robbery, and kidnap to commit rape, and was sentenced to a term of life with the possibility of parole, plus three years.  (CT 88-91; CT 156.)  This Report and Recommendation is submitted to Chief United States District Judge Irma E. Gonzalez, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  The Court has considered the First

Amended Petition, Respondent's[1] Answer and Memorandum of Points and Authorities In Support Thereof ("Ans. Mem."), and Petitioner's Traverse, as well as all the supporting documents submitted by the parties. Based upon the documents presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## I.   FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal opinion in People v. Threats, No. D048089 slip op. (Cal. Ct. App., 4th Dist. Div. 1, January 16, 2007). (Lodgment No. 3.) This Court gives deference to state court findings of fact and presumes them to be correct. Sumner v. Mata, 449 U.S. 539, 547 (1981) (stating that deference is owed to factual findings of both state trial and appellate courts); see also Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990) (holding factual findings of state trial and appellate courts are entitled to presumption of correctness on federal habeas corpus review). The factual history provided by the state appellate court is lengthy and detailed and is recounted below in its entirety.

Because Threats challenges the sufficiency of the evidence, we set out the whole record in the light most favorable to the judgment (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 (*Hillhouse*)), which show that in the early morning hours of December 21, 2004, Threats was arrested at Buccaneer Beach in Oceanside, California, after being identified curbside as the man who had just sexually attacked Carly W. in the DAV (Disabled American Veterans) parking lot off of the Pacific Coast Highway (PCH) and had taken her purse.

At the trial on the above charges, Carly testified she had been drinking with friends at a bar in Oceanside until shortly after 1:00 a.m. on December 21, 2004, when she decided to walk home along PCH. Along the way she bumped into some friends, who walked with her awhile before she continued alone from the area near a drug store toward her home. As Carly crossed from the beach side of PCH to the sidewalk on the east side of the highway in front of some closed businesses, she was passed by a man on a skateboard who exchanged greetings with her. A few minutes later, as she was walking past the DAV building, a man running three to four feet from her on the right, charged her, hitting her on the side of the head with his fist. As she fell backwards, he grabbed her and carried her approximately 15 to 20 feet from the sidewalk into the adjacent DAV parking lot. When she screamed, the man told her to "shut the fuck up."

---

[1] Petitioner names Attorney General Jerry Brown as an Additional Respondent in this case. (See Doc. No. 4.) The Court ruled that he was not a proper Respondent in this action. (See Doc. No. 9.) Moreover, the only Respondent that filed an Answer was Secretary of the California Department of Corrections and Rehabilitation Matthew Cate. (See Doc. No. 10.) Therefore, all references to Respondent in this Report and Recommendation refer to Respondent Cate.

When Carly struggled and continued screaming, the man dropped her on her knees, threw her on her back, got on top of her, pinned her down on the ground, covered her mouth with his hand, and again told her "to shut the fuck up" or he would "snap [her] neck." As the man then started messing with her clothes, Carly told him there was money in her purse that had flown out of her hands and had landed about five feet away from her when he had pushed her to the ground. She also told the man she "had family." The man did not care, telling her that he "just wanted to fuck the shit out of [her]." When the man tried to take Carly's pants off by unlatching her belt and pulling them down, the latch on the belt flipped back and the pants would only come halfway off her hips. When Carly started screaming again, the man grabbed her forehead and smacked her head onto the ground about five times, causing bruising and lumps all over her forehead.

Carly estimated that about two to three minutes after the attack began, three people came running over and screaming into the parking lot from across the street, and the skateboard man came "running around the corner" towards them. At that point, the man stopped his activity, picked Carly up by her crotch, threw her over his shoulders, and tried to carry her further into the parking lot, but dropped her after a couple of steps. As the people approached them, the man grabbed Carly's purse and ran through the back of the parking lot while she got up screaming and called her dad, using a phone from one of the people. The man on the skateboard chased the attacker.

When Oceanside Police Officer Mark LaVake responded to the scene, Carly, whose knees and upper back were scraped and bleeding, pants ripped and clothing disheveled, ran up to him and grabbed him in a "death grip," crying hysterically. Carly gave LaVake a description of the suspect and an initial statement. Carly said her attacker was wearing a white shirt and blue shorts, but she was not sure whether he was wearing any shoes. The man on the skateboard, who had returned to the parking lot and was then identified as Ricky Estrada, also talked with LaVake, giving a description of Carly's attacker that matched the one she had given, and additionally noted the man was not wearing any shoes. As Lavake broadcast a description of the suspect to other officers, Estrada left again to look for the attacker. Estrada returned shortly to the parking lot to report that the suspect was walking at Buccaneer Beach.

Several Oceanside police officers then went to the beach and detained the suspect, who was wearing shorts and appeared to have fresh scratches on his chest and arms, an injury to the top of his head, and a cut on his right palm. While LaVake drove Carly to the suspect's location, Estrada skateboarded there. Both Carly and Estrada said the man, whose identity was determined to be Threats, was Carly's attacker. Threats was arrested and searched. A dollar bill, his wife's ATM card, and car keys were found in Threats's possession. Police later located a white t-shirt in the middle of some rocks on the beach where Threats had been found.

Carly testified that she met with another Oceanside police officer the next morning at the crime scene. The officer then measured the distance from where she had first been accosted to the area in the DAV parking lot where she had been carried. Such measured 44 feet. Carly also called the police later that evening after she received a visit from a man named Anthony Florio who had found her purse and its contents. Nothing was missing from the purse. Carly noted she carried no money in her purse the night of the attack. Although the police dusted the purse for fingerprints, no useable prints were found. Carly identified Threats in court as her attacker.

On cross-examination, Carly said that the area where she was carried was an open area with no bushes or parked cars, and that there was one light in the parking lot. She thought the lighting was "about the same" in the parking lot as along PCH. The area where she was taken was "[a]way from the street." She did not recall "what time [her] purse flew out of [her] hands and flew somewhere . . . next to [her]." Threats picked up her purse after he had dropped her as he tried to carry her further into the parking lot.

Estrada testified that when he passed a woman, who he later learned was Carly, as she walked on the sidewalk next to PCH at 2:30 a.m. on December 21, 2004, she appeared nervous and started walking really fast after he had said hello to her. When he turned off PCH onto Morse Street, he could not see her any longer, but he saw a man without shoes, who was wearing a t-shirt and blue shorts, running from the area of a motel across the street toward the area where she had been walking. When Estrada then heard a woman screaming, he went back around the corner on his skateboard to the area near the DAV parking lot where he had seen Carly to see "what was happening." When he rode into the parking lot, Carly was "halfway lying down [on the ground]," struggling to get away from the man who had his hands on her upper arms as he stood facing her and pushing on her. As the man then shook her several times, causing her head to hit the ground, Estrada yelled at the man, "Hey, what the hell is going on?" Although the man looked at Estrada, he did not seem fazed, and continued striking Carly's head on the ground. When Estrada threatened to hit the man with his long skateboard, he started to run and jump over a fence at the back of the DAV parking lot. Estrada believed there was a purse on the man's shoulder when he ran away.

Estrada thought the lighting in the DAV parking lot was "really good" because it was "close to the corner" where other street lights were. He clarified during further questioning, however, that when he first ran from Morse to the area of the sidewalk where a fence ends by the DAV parking lot, he did not see Carly and the man on the street or in the parking lot. Nor did he see the initial contact, the man carry Carly into the parking lot, or the man pick up a purse. Estrada went further into the parking lot when he heard the woman scream again. When Estrada saw the incident going on, the man already had the purse on his shoulder. Three people came up as the man ran off. After watching the man jump the fence and turn left, Estrada walked back towards Morse to try to find the man there. In addition to having picked Threats's photograph out of a photo line-up as the man who had attacked Carly, Estrada also identified Threats in court as her assailant.

Florio, who lived above a garage on property overlooking a street that ran along the back part of the DAV building and "due east" of the parking lot, was awakened by screams around 2:00 a.m. on December 21, 2004, coming from the DAV area. When he looked out the window he could not see anything because it was "so dark over there." When Florio went out on his balcony, he heard someone yell at a man in a white shirt and blue boxers, who Floria [sic] then saw running. Florio also saw some people walking along PCH at that time. He explained that "there's more light down by the street than over here (indicating). This is all dark out here (indicating)." Florio lost sight of the man who was being chased by a white man, as he ran towards his house. Shortly thereafter, Florio heard some rocks drop from his fence out back and assumed somebody had jumped over the fence.

When Florio went down to his garage to go to work at about 7:00 a.m. that same morning, he discovered an open purse with its contents scattered in the garage. He picked everything up and put it aside until he returned from work that

4

day around 4:30 p.m.  Florio then took the purse and its contents to the address on a driver's license he found inside the purse and returned everything to its owner Carly.

In addition to the above evidence, Officer LaVake testified about the lighting in and around the crime scene area.  He noted there was "good lighting on [PCH]" because there were "street lights up and down," but that the DAV parking lot near the corner of Morse and PCH was "darker" and "not as well lit as the street" because there was only one light on each side of the lot.  LaVake explained that the lighting in the parking lot "gets less" as one "goes father east towards the back end. . . ."  He noted there were "shadow" areas that were not as light as the street.

Forensic evidence was also presented in the prosecution case which showed that a blood stain on the white t-shirt found by police matched Threats's DNA profile, that Carly was a possible donor of nail scrapings collected from Threats's left hand, that Threats was excluded as a possible source of nail scrapings from Carly's right hand, and that nail scrapings from Threats's right hand and Carly's left hand were insufficient for DNA analysis.

*The Defense Case*

Threats testified in his own defense.  In the early morning of December 21, 2004, around 2:20 to 2:25 a.m., he had driven to Morse Street near PCH from his home in Oceanside, where he lived with his wife, children, and wife's mother, to go jogging at Buccaneer Park and Beach and to pay for a prostitute to get "a blow job."  Threats explained that he decided to look for a prostitute because he was upset with his wife and the two had not been intimate for about two and a half to three months.

After parking his car on Morse, Threats saw a woman, later identified as Carly, crossing that street and thought she was "working the streets."  When he jogged behind her right side at an angle, Carly jumped and turned to look at him, appearing startled.  As he began telling her he thought she was a prostitute, and if she were, he could pay because he had a credit card, Carly started screaming and swinging her arms at him.  About 10 to 15 seconds later, Threats saw a man with a skateboard in his hand running towards him.  Thinking the man was Carly's boyfriend or "pimp," and that he was being set up to be robbed, Threats ran through the DAV parking lot, jumped the fence, cutting his hand, and then ran towards Buccaneer Park and some railroad tracks, where he started to walk to the beach.  When he got to the beach, he took his t-shirt off and tossed because it was ripped.  Threats also noticed that he had bruises he had not had before.

As he walked along the beach, Threats saw some lights and some police officers, who told him to stay and kneel down.  Threats complied and was placed in handcuffs.  He initially told the police that he had not seen or had any contact with Carly.  After somebody was brought by to identify him, he was arrested for robbery and rape.  Threats denied he attacked or ever touched Carly.  He also denied that he took Carly's purse.

On cross-examination, Threats said his only contact with Carly was on the sidewalk in front of the DAV parking lot and that both she and Estrada, the man with the skateboard, were lying.  Threats conceded he had lied to police, but explained he did so only because he did not understand what was going on or know the legal system.

(Lodgment No. 3, <u>People v. Threats</u>, No. D048089, slip op. at 2-9.)

## II.      PROCEDURAL BACKGROUND

Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One, case number D048089, raising three grounds for relief.  (Lodgment No. 6.) Appellant's opening brief was filed on July 3, 2006, Respondent's brief was filed on August 18, 2006, a supplemental Respondent's brief was filed on August 25, 2006, and Appellant's reply brief was filed on September 13, 2006.  (Lodgment Nos. 6, 4, 5, 2.)  The Court affirmed Petitioner's conviction and sentence in an unpublished opinion filed on January 17, 2007.  (Lodgment No. 3.)  On February 20, 2007, Petitioner filed a petition for review in the California Supreme Court, which was denied on March 28, 2007.  (Lodgment Nos. 22, 21.)

On January 11, 2008, Petitioner filed a petition for writ of habeas corpus in the San Diego County Superior Court, raising three grounds for relief.  (Lodgment No. 24, case no. HCN0949.) On February 22, 2008, the petition was denied.  (Lodgment No. 23.)  On April 11, 2008, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, raising three grounds for relief.  (Lodgment No. 18, Case No. S166048.)  The petition was summarily denied, without comment or citation of authority, on February 18, 2009.  (Lodgment No. 17.)

## III.      SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

As discussed in detail below, the claims presented in the federal Petition were adjudicated on their merits in the state courts.  As amended, 28 U.S.C. § 2254(d) now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006).

Because his claims were adjudicated on the merits in state court, to obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguish-able facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13; Lockyer v. Andrade, 338 U.S. 63, 72-73 (2003).

## IV.   **DISCUSSION**

The First Amended Petition, the operative pleading in this action, contains five claims for relief. (Doc. No. 4.) Petitioner claims that his federal constitutional rights were violated, and therefore his custody is unlawful, because: (1) the evidence was insufficient to support Petitioner's conviction of kidnap for rape; (2) the evidence was insufficient to support Petitioner's conviction of robbery; (3) the trial court failed to instruct the jury on a lesser included offense; (4) the trial court refused to give a defense pinpoint instruction on after-acquired intent; and (5) the cumulative effect of errors at Petitioner's trial deprived him of due process. (FAP at 6-10.)

**A.   Claims One and Two- Sufficiency of the Evidence**

**1.   Kidnap for Rape conviction**

Petitioner contends in Claim One that his "conviction for kidnaping to commit robbery or rape is unlawful because the evidence was insufficient to establish that his movement of the victim substantially increased the risk of harm and was not merely incidental to the underlying offense." (FAP at 6.) Respondent argues that the court of appeal concluded that Petitioner

carried the victim 44 feet from a public sidewalk to a relatively dark parking lot before attempting to rape her, and that such movement was not necessary, nor simply incidental, to the commission of the rape, which constituted sufficient evidence in support of the kidnap for rape conviction. (Ans. Mem. at 11.)  Respondent maintains that the state court's rejection of this claim on the merits was not contrary to, nor an unreasonable application of, clearly established federal law. (Id. at 9.)  In the Traverse, Petitioner reasserts that the evidence was insufficient because "the area the victim was moved to did not place the victim in any more harm or danger than what was already present on the sidewalk," and that "it was not less likely for a passerby to see or help the victim in the parking lot because, as stated before, there was nothing to block anyone's view of the attack." (Traverse at 4.)

Petitioner raised this claim in his petition for review to the California Supreme Court, which denied the claim without comment or citation to authority. (Lodgment No. 21.)  Thus, the Court must "look through" that opinion to the state appellate court's reasoned resolution of the claim. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no* effect- which simply "looks through" them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (italics in original).  The state appellate court denied the claim, stating in part:

> In this case, Threats originally encountered Carly in the middle of the night on the sidewalk next to PCH in front of several closed businesses.  He then attacked her and carried her 44 feet away from the sidewalk and street around the side of the DAV building, into its adjacent parking lot going toward the back, where the lighting was much darker and contained shadows, before he started disrobing her in his attempt to rape her. On these facts, the movement of Carly was not merely incidental to the commission of the underlying sexual assault. Although the movement was arguably done to facilitate completing the rape, it was not necessary for completion of that crime.  As this court noted in *People v. Salazar* (1995) 33 Cal.App.4th 341 (*Salazar*), "a rape ... does not necessarily require movement to complete the crime." (*Id.* at p. 348, fn. 8.)

> Because it was very early in the morning and no one else was around when Threats approached Carly on the PCH sidewalk in front of the closed DAV business, he could have simply raped Carly there and avoided moving her at all. "Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape. [Citations.]" (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169

(*Shadden*).)  Similar to the situation in *Shadden*, where the defendant dragged the victim from the front of a video store into a back room where he attempted to rape her, the jury could have reasonably inferred that the movement of Carly from the sidewalk to the darker parking lot away from the street was not incidental to the attempted rape because Threats only began his sexual assault after he moved and dropped Carly in the parking lot.  (*Ibid.*)

As noted above, the jury was properly instructed on its need to find the movement was "more than slight, brief or trivial" in order to support the first prong, "Where movement changes the victim's environment, it does not have to be great in distance to be substantial.  [Citation.]"  (*Shadden*, *supra*, 93 Cal.App.4th at p. 169.)  Threats carried Carly 44 feet from a sidewalk on a lighted street, around the corner of a closed business building into its darker parking lot away from the street.  From these facts the jury could reasonably infer that the movement changed Carly's environment, was for a substantial distance, and was not necessary to the commission of an uninterrupted rape.

Contrary to Threats's reliance on kidnapping for robbery cases where movement is often necessary to complete the crime or where the movement is in a confined area, the underlying nature of the crime of robbery is quite different from a sexual assault or rape.  Sexual offenses necessarily require close physical proximity between the victim and the defendant.  Movement of the victim is simply "not a necessary or a natural part of committing [a] rape."  (*Salazar*, *supra*, 33 Cal.App.4th at p. 347.)

Moreover, Threats's movement of Carly subjected her to an increase in the risk of harm above and beyond that necessarily present in rape itself satisfying the second-prong of *Daniels*, *supra*, 71 Cal.2d 1119.  (*Rayford*, *supra*, 9 Cal.4th at p. 13.)  "[W]here a defendant moves a victim from a public area to a place out of public view, the risk of harm is increased even if the distance is short."  (*Shadden*, *supra*, 93 Cal.App.4th at p. 169.)  Here, as stated before, Threats forced Carly in the middle of the night from a sidewalk on the side of a well-lighted street to a spot in an adjacent parking lot 44 feet away from the street.  Although the distance may not be that great, evidence revealed Carly was moved to a darker outdoor location where it was less likely any passing driver or person walking on the sidewalk by the closed businesses would see her.  Such movement "thus changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue."  (*Dominquez*, *supra*, 39 Cal.4th at p. 1153; see also *People v. Diaz* (2000) 78 Cal.App.4th 243, 248 [victim moved from well lit sidewalk to the dark isolated area around the back of a recreation center].)

Nonetheless, Threats argues the evidence of asportation was insufficient because Carly's testimony showed the parking lot was "open and lit" with no obstructions to lessen the risk of detention and that she was in fact able to summon help from her location in the parking lot.  Threats, however, fails to appreciate that the evidence was conflicting as to the lighting, with Officer LaVake and Florio testifying the parking lot was "darker" and "not as well lit as the street" and Estrada clarifying he could not see the attack until he got into the parking lot, and that conflicts in the evidence are purely within the trier of fact's province to resolve.  (See *People v. Kraft* (2000) 23 Cal.4th 978, 1054.)  We do not reweigh the evidence.

Moreover, that Carly was eventually rescued due to her persistent screaming, does not change the fact that Threats removed her from public view on

9

the street's sidewalk to an area more obscured from public view. Carly's rescuer Estrada was only able to get a good view of Threats attacking Carly when he turned off the street, entered the parking lot, and followed her screams to within a "couple of feet" from them. By that time, Threats had already started his sexual assault on Carly and had bashed her head against the pavement numerous times. Contrary to Threat's assertion, forced movement of a victim to an "enclosure" so that detection is not possible, is not necessary to show an increase in the risk of harm. (*Dominguez, supra*, 39 Cal.4th at p. 1154.) Rather, a jury could reasonably infer from the evidence in this case, including the time of night, the delayed detection, and the isolated environment where Threats had carried Carly, that no passersby on the street, either in cars or on foot, would likely enter the empty, dark parking lot away from the street and adjacent to the closed DAV business to determine whether any people were there and crimes were being committed.

Further, Threats's reliance on *People v. Stanworth* (1974) 11 Cal.3d 588 (*Stanworth*),[FN4] where the 25-foot movement of the victim from a road to an open field in the early evening was deemed not to be substantial, is unfounded. In *Stanworth* "there is no evidence that the relatively brief movement of the victim ... removed her from public view or in any other manner substantially increased the risk, beyond that inherent in the underlying crimes, that she would suffer physical harm." (*Id.* at p. 598.) Unlike *Stanworth*, Threats's forced movement of Carly here removed her from public view on a well-lit street to a darker, isolated area away from the street where they were less detectable from public view and increased her risk of harm.

> [FN4] " *Stanworth's* discussion of the asportation standard for simple kidnapping was disapproved in part in [*Martinez, supra,*] 20 Cal.4th [at pp.] 233-235." (*Dominguez, supra*, 39 Cal.4th at p. 1154, fn. 7.)

In sum, considering the context of the forced movement of the victim here and viewing the evidence in the light most favorable to the People, we conclude there was sufficient evidence of asportation as defined under the two-pronged test of *Daniels, supra*, 71 Cal.2d 1119 which was reiterated in *Rayford, supra*, 9 Cal.4th 1, to support the jury's verdict. (See *Dominguez, supra*, 39 Cal.4th at pp. 1153-1155.) Accordingly, we affirm the count 1 kidnapping for rape conviction.

(Lodgment No. 3, <u>People v. Threats</u>, No. D048089, slip op. at 13-17.)

The clearly established federal law regarding sufficiency of the evidence claims is found in <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979). In that case, the Supreme Court held that a habeas petitioner is not entitled to relief unless "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Id.</u> A reviewing court is not authorized "to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt" in making this determination. <u>Id.</u> Instead, the court reviews the facts in the record in full and in the light most favorable to the judgment, and must presume the trier of fact resolved conflicting evidence in favor of the prosecution. <u>Id.</u> at 319.

In this case, the state appellate court stated that it must conduct a complete review of all the facts presented in the record "in the light most favorable to the judgment" to determine "whether there is substantial direct or circumstantial evidence the defendant committed the charged crime." (Lodgment No. 3 at 9, <u>citing</u> <u>People v. Hillhouse</u>, 27 Cal. 4th 469, 496 (2002); <u>People v. Rodriguez</u>, 20 Cal. 4th 1, 11 (1999).) This standard is consistent with <u>Jackson</u>, and did not involve materially indistinguishable facts. Therefore, the appellate court's decision was not "contrary to" clearly established federal law. <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002); <u>Williams</u>, 529 U.S. at 413.

Nor was the state court's decision an unreasonable application of clearly established Supreme Court precedent. In determining whether it was unreasonable for the state appellate court to conclude that sufficient evidence existed to support Petitioner's conviction, this Court begins with "explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004); <u>Jackson</u>, 443 U.S. at 324. Under California law, the elements for finding a criminal defendant guilty of kidnapping to commit rape are:

1. A person was moved by the use of physical force;
2. The movement of that person was caused with the specific intent to commit rape, and the person causing the movement had the required specific intent when the movement commenced;
3. The movement of the person was without that person's consent;
4. The movement of the person was for a substantial distance, that is, a distance more than slight, brief or trivial; and
5. The movement substantially increased the risk of harm to the person moved, over and above that necessarily present in the crime of rape itself.

California Jury Instructions, Criminal ("CALJIC") 9.54 (2007 Revision).[2]

As the state court concluded, viewed as required in the light most favorable to the verdict, a rational trier of fact could have found that Petitioner was guilty of kidnap for rape. The victim testified that she was hit by Petitioner during the initial assault, who then carried her from the sidewalk into the parking lot, and while she screamed and struggled Petitioner told her to shut up, got on top of her, and attempted to take her pants off. (Lodgment Nos. 7-11; Reporter's

---

[2] The 2007 Revision is the most recent version of CALJIC 9.54, but no substantive differences exist between the current version and the instruction given at Petitioner's trial.

Transcript ["RT"] at 86-89.)  When the victim said she had money in her purse, he said he wanted sex, and when she continued to scream, he grabbed her forehead and started smacking her head into the ground.  (RT 89-90.)  The victim testified that when other individuals came to the area, Petitioner picked her up by her crotch, threw her on his shoulders and attempted to carry her further into the parking lot, but after a few seconds dropped her, grabbed her purse and ran away.  (RT 91-92.)

The victim testified that she thought the sidewalk and the street were lit "about the same," and there were no bushes or parked cars in the area, later adding that when Petitioner assaulted her, he took her "away from the street" and carried her "farther into the parking lot."  (RT 107,-08, 114.)  Ricky Estrada, a witness who came to the victim's aid at the sound of her screams, testified that the DAV parking lot was "really close to the corner, so the lighting is really good," but later clarified that he had to leave the sidewalk and go farther into the parking lot before he was able to see the victim and her attacker.  (RT 168-69.)  Officer LaVake testified that the lighting on the highway was good, with street lights up and down, but the DAV parking lot was darker and not as well lit as the street, and the farther one proceeded into the lot, the darker it became.  (RT 185-92.)  The victim initially estimated that Petitioner carried her "15, 20 feet" into the parking lot during the assault, but noted during her testimony that she later visited the scene with an officer who measured the distance from the sidewalk to the site of the attack to be "40, 50 feet."  (RT 83-84.)  Anthony Florio, a man who lived in a house near the DAV and found the victim's purse in his garage the morning after the attack, also testified that the back part of the DAV parking lot was dark.  (RT 229.)

Petitioner argues that "it was not less likely for a passerby to see or help the victim in the parking lot" because "there were no walls, fences, or barriers of any kind that either enclosed or concealed the assault."  (Traverse at 4.)  Petitioner contends that Estrada's testimony was misleading because there were no obstructions to his view of the parking lot from the sidewalk, and the testimony of Florio and Officer LaVake only established that the parking lot was "slightly darker" than the sidewalk.  (Id.)

///

09cv0816

Under state law, aggravated kidnapping, in this case kidnapping for rape, requires movement of the victim: (1) that is not merely incidental to the commission of the crime, and (2) which substantially increases the risk of harm over an above that necessarily present in the underlying crime itself. See People v. Rayford, 9 Cal. 4th 1, 12 (Cal. 1995); People v. Daniels, 71 Cal. 2d 1119, 1139 (Cal. 1969). Here, the victim was forcibly moved 44 feet, late at night, from a lit sidewalk on a highway into a deserted parking lot, which, by most accounts, was darker the farther one moved from the street. Moreover, while witness Estrada was summoned by the victim's screams, he stated that he was unable to see the attack until he left the sidewalk and went farther into the parking lot. In light of this evidence and the testimony recounted above, a rational juror could have found beyond a reasonable doubt that Petitioner's movement of the victim at that time of night, with force and without her consent, from the sidewalk to a darker, empty parking lot, away from passing cars and pedestrian traffic, was not merely incidental to the commission of rape and exposed her to a substantially increased risk of harm. See Jackson, 443 U.S. at 324; see also People v. Diaz, 78 Cal. App. 4th 243, 248 (Cal. Ct. App. 2000) (appellate court found sufficient evidence of an increased risk of harm not incidental to a sexual assault where defendant moved victim from bus stop to more isolated open area less visible to the public, stating "the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk . . . where the incident began.")

This Court has independently reviewed the transcripts of the state court proceedings and concludes that the jury could have reasonably found that Petitioner was guilty of kidnapping to commit rape. (See RT 83-92, 107-08, 114, 168-69, 185-92, 229.) The Court thus finds the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. See Jackson, 443 U.S. at 324; Williams, 529 U.S. at 412-13. The Court recommends **DENYING** relief on Claim One.

## 2. Robbery conviction

Petitioner alleges in Claim Two that his "conviction for robbery is unlawful because there was insufficient evidence to establish that he had the requisite intent to deprive the victim of her purse at the time he assaulted her." (FAP at 9.) Respondent argues that the "state appellate court

13

applied the equivalent of the *Jackson* standard in reviewing the sufficiency of the evidence proving this element," and their rejection of this claim was consistent with clearly established Supreme Court precedent.  (Ans. Mem. at 12-13.)  In the Traverse, Petitioner emphasizes that the only evidence the jury could have used to convict him on the robbery charge was the testimony of Estrada, whose "testimony regarding the purse is neither reliable or credible to sustain a conviction for robbery."  (Traverse at 6.)

This claim was presented to the California Supreme Court in a petition for review.  (Lodgment No. 22 at 17-22.)  The state supreme court denied the petition without comment or citation to authority.  (Lodgment No. 21.)  Because the California Supreme Court did not articulate its rationale for denying this claim, this Court must "look through" to the underlying appellate opinion.  Ylst, 501 U.S. at 806.  The state appellate court denied this claim on the merits, stating in part:

> Threats also claims his robbery conviction should be reversed because there was insufficient evidence he harbored the requisite intent to steal at the time he used force on Carly.  We disagree.
>
> With regard to the crime of robbery, section 211 provides that "[r]obbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  Generally, "[t]o support a robbery conviction, the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force. [Citation.]"  (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)  If a defendant forms the intent to steal only after the victim is assaulted, "the robbery element of stealing by force or fear is absent.  [Citations.]"  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055-1056 (*Bradford*).)  However, "[w]here a defendant begins a sexual assault, aware that the victim has property and takes it, the jury may infer the defendant intended to commit both rape and robbery.  [Citations.]  Or it may infer that the force used for the sexual offense was also force for robbery.  [Citations.]"  (*Shadden*, *supra*, 93 Cal.App.4th at p. 170.)  An intent to rob may be proved by inferences from all of the circumstances of the case.  (*People v. Vizcarra* (1980) 110 Cal.App.3d 858, 863.)
>
> Here, the evidence showed that Threats only had one dollar and a Visa card with him when he first attacked Carly.  At that time she was startled, afraid, and screaming as she told him she had money in the purse she carried.  Even though he initially said he did not care and that he was only interested in sex, at some point after Carly started screaming again and struggling with him, he ended up with her purse.  Although Carly testified Threats did not pick up the purse until he was frightened off by Estrada with his skateboard, Estrada testified Threats had the purse over his shoulder when he approached him as Threats was slamming Carly's head into the ground.  The responding officer noted that Carly was hysterical when he first arrived.  Carly further clarified in her testimony that she was uncertain at what point Threats took her purse.  Threats denied taking the

purse, but argued in closing that whoever did take the purse did so as an afterthought and did not form the intent to steal the purse until after the attempt to sexually attack Carly was complete. The jury requested a reread of those portions of Carly's and Estrada's testimony regarding the purse.

From the totality of this evidence, a jury could reasonably have inferred that in Threats's frustration at not being able to rape Carly, he formed the intent to steal her purse to get some money while he was still attacking her. The jury could have found Carly's memory of the sequence of events regarding the purse clouded due to her fear and hysteria during and just after the attack, and found that Estrada's recollection that Threats already had the purse in his possession when he happened upon the scene was the correct version of the incident. From such facts the jury could have inferred Threats had formed the intent to steal Carly's purse while he was using force even though his attempt to sexually assault her had been unsuccessful. Thus viewing the evidence in the light most favorable to the judgment and drawing all reasonable inferences from the facts, there was substantial evidence from which a reasonable juror could infer Threats's intent to steal arose during his forceful acts against Carly and while she still feared for her life.

Contrary to Threats's reliance on *Rodriguez v. Superior Court* (1984) 159 Cal.App.3d 821 (*Rodriguez*) to support his position there was no evidence he harbored the requisite intent to steal at the time he used force on Carly, the facts of that case are distinguishable from the instant case. In *Rodriguez*, the defendant was not aware that the victim's purse was in his car at the time he drove off after forcing the victim out of the car and raping her. (*Id.* at pp. 823-824.) In this case, however, Threats was fully aware of Carly's purse before and during the time he assaulted her. Although Carly testified that Threats had stated he was not interested in the purse and only wanted sex with her at the beginning of the assault, the jury was not bound to limit its view of the evidence to only that time. Because there was also evidence that Threats continued to beat Carly after he was unable to remove her pants and that he had the purse on his shoulder when Estrada appeared on the scene, the jury could have reasonably inferred that Threats had formed the intent to take Carly's purse by force and fear in such latter part of the attack on Carly. (See also *Shadden*, *supra*, 93 Cal.App.4th at pp. 170-171.)

In sum, we conclude there is sufficient substantial evidence in this record to support the count 3 robbery conviction.

(Lodgment No. 3 at 17-20.)

As stated in the discussion of Claim One, *supra*, the established federal law regarding sufficiency of the evidence claims is found in Jackson, 443 U.S. at 324. As with Petitioner's Claim One, the appellate court's decision on the instant claim was not "contrary to" clearly established federal law set forth in Jackson. Although the state court did not cite to Jackson or federal law in issuing its decision, it applied the same standard. (See Lodgment No. 3 at 10 (stating that the inquiry is whether "any rational trier of fact could have found the essential elements of [the charged offenses] beyond a reasonable doubt.").) Because the state court

15

identified and applied the appropriate standard, and the facts here are not materially indistinguishable from Jackson, its decision is not "contrary to" clearly established Supreme Court law.  See Early, 537 U.S. at 8.

Nor is the state court's decision an unreasonable application of Jackson.  Under California law, to support a robbery conviction, the evidence must demonstrate that Petitioner had the requisite intent to steal either before or during the commission of the act of force.  See People v. Marshall, 15 Cal. 4th 1, 34 (1997).  As the state court reasonably concluded, viewed as required in the light most favorable to the verdict, a rational trier of fact could have found that Petitioner was guilty of robbery.

The victim testified that Petitioner hit her, took her into the parking lot, got on top of her, and that "my purse flew out of my hands when I fell to the ground.  It was about 5 feet away from me.  And I looked at my purse, and I didn't know what to do or say.  So I told him I had money in my purse and that I had family."  (RT 89.)  The victim testified that Petitioner responded by stating that he did not care, and that "he just wanted to fuck the shit out of me.  That's it." (RT 89.)  The victim testified that when she continued to scream, Petitioner hit her head on the sidewalk several times, and when people came running to the area, he attempted to picker her up and carry her father into the parking lot.  (RT 89-92.)  The victim stated that Petitioner then dropped her, "grabbed my purse and ran through the parking lot."  (RT 92.)

Ricky Estrada, who responded to the scene at the sound of a woman's screams, testified that when Petitioner fled the scene he had something around his shoulder, and said it was "[a] purse.  I don't know.  Something -- something white.  It looked like a purse."  (RT 138).  Estrada added that he did not see Petitioner pick up the purse, because it was already on Petitioner's shoulder when Estrada arrived at the site of the attack.  (RT 166.)

Petitioner contends that the victim's testimony does not support a conclusion that he had the intent to deprive the victim of her purse at the time of the assault, and argues that Estrada's testimony is compromised by his incorrect description of the purse's color as white, when it was actually black.  (Traverse at 5-7.)  However, a petitioner raising a sufficiency of the evidence claim is only entitled to habeas relief if "no rational trier of fact could have found proof of guilt

09cv0816

beyond a reasonable doubt."  <u>Jackson</u>, 443 U.S. at 324.  As stated above in the discussion of Claim One, this Court must review the facts in the record in full and in the light most favorable to the judgment, and must presume the trier of fact resolved conflicting evidence in favor of the prosecution.  <u>Id.</u> at 319.

Based on the facts recounted above and the Court's independent review of the trial proceedings, the Court finds the jury could have reasonably concluded that Petitioner formed the intent to steal the victim's purse during the assault and was guilty of the charged robbery. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  <u>See</u> <u>Jackson</u>, 443 U.S. at 324; <u>Williams</u>, 529 U.S. at 412-13.  This Court recommends **DENYING** relief on Claim Two.

**B.      Claims Three and Four- Jury Instruction errors**

**1.      Trial Court's Failure to Instruct on a Lesser Included Offense**

Petitioner alleges in Claim Three that his "conviction for robbery is unlawful because the trial court improperly refused to instruct the jury on the lesser included offense of theft."  (FAP at 11.)  Respondent asserts Petitioner is not entitled to relief on this claim because (1) Petitioner fails to present a federal question; and (2) the absence of an instruction on simple theft did not result in any prejudice to Petitioner. (Ans. Mem. at 13-15.)  In the Traverse, Petitioner maintains that the failure to provide this instruction does present a federal question and was "an integral part of the Petitioner's theory of the case."  (Traverse at 8.)

**a.      Failure to State a Claim and <u>Teague</u>**

Respondent argues that Claim Three fails to present a federal question cognizable in this proceeding and notes that the Ninth Circuit previously held a claim of this ilk to be <u>Teague</u>-barred.  (Ans. Mem. at 13.)  Respondent relies on  <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106 (9th Cir. 1998), in which the Ninth Circuit stated that "the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a constitutional question." (Ans. Mem. at 14.)

Moreover, in <u>Turner v. Marshall</u>, 63 F.3d 807, 818-19 (9th Cir. 1995), the Ninth Circuit found that a requirement to instruct on lesser offenses in a non-capital case would constitute

application of a new rule prohibited by <u>Teague v. Lane</u>, 489 U.S. 288 (1989).  Therefore, it appears that Petitioner is seeking to create a new rule of criminal procedure, one whose "result was not dictated by precedent existing at the time defendant's conviction became final." <u>Teague</u>, 489 U.S. at 301.  Further, Petitioner's proposed rule does not satisfy either exception to <u>Teague</u>. <u>See</u> <u>Penry v. Lynaugh</u>, 492 U.S. 302, 305 (1989), <u>abrogated on other grounds</u>, <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002); <u>Graham v. Collins</u>, 506 U.S. 461, 478 (1993).

Alternately, assuming Claim Three would not be barred under <u>Teague</u>, it is without merit for the reasons set forth below.

### b.    Merits

Petitioner raised this claim in a petition for review before the California Supreme Court, which denied his claim in an opinion stating in full, "The petition for review is DENIED." (Lodgment No. 21.)  As before, the California Court of Appeal issued the last reasoned decision on this claim and the Court must "look through" to that appellate opinion.  <u>Ylst</u>, 501 U.S. at 806. The state court denied the claim on the merits, stating:

> On appeal, Threats contends the trial court prejudicially erred when it denied his request to instruct the jury on the LIO of theft for his count 3 robbery charge.  Although we agree the court's refusal to do so was error, we conclude the error was harmless on this record.
>
> The general rule is that in a criminal case the trial court "'has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense.' [Citation.]" (*Bradford*, *supra*, 14 Cal.4th at p. 1055.)  "Theft is a lesser included offense of robbery, which includes the additional element of force or fear." (*People v. Melton* (1988) 44 Cal.3d 713, 746.)  As already noted above, if the intent to steal arises "only after the victim was assaulted, the robbery element of stealing by force or fear is absent. [Citations.]" (*Bradford*, *supra*, 14 Cal.4th at pp. 1055-1056.)
>
> Any error in failing to instruct on a lesser included offense which is supported by the evidence, "must be reviewed for prejudice exclusively under [*People v. Watson* (1956) 46 Cal.2d 818].  A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. omitted (*Breverman*).)
>
> Here, although Threats testified he did not take Carly's purse, Carly initially testified Threats had taken her purse after he had stopped attacking her

and at the time he was running away. Though Carly later changed her testimony to say she was unsure of when Threats actually took the purse, and Estrada testified that Threats had already taken the purse when he arrived on the scene of the on-going attack, we believe Carly's testimony provided a sufficient conflict in the evidence to require instruction on theft as a lesser offense of robbery. Similar to the situations in *Bradford*, *supra*, 14 Cal.4th 1005 and *People v. Ramkeesoon* (1985) 39 Cal.3d 346 (*Ramkeesoon*), there was sufficient evidence in this case that, if believed by the jury, would support the LIO of theft rather than the charged robbery, and the court failed to so instruct the jury. (*Bradford*, *supra*, 14 Cal.4th at p. 1056; *Ramkeesoon*, *supra*, 39 Cal.3d at p. 351.) We thus find, as the courts did in *Bradford* and *Ramkeesoon*, that the trial court erred in not instructing on the LIO of theft.[FN5]

> [FN5] Although not raised as error on appeal, we also believe the court erred in failing to grant Threat's additional request to give a pinpoint instruction on after-acquired intent for robbery.

Moreover, as in those cases, because the jury had not been instructed on "after-formed intent," the factual question posed by the omitted theft instruction, and the robbery instruction alone does not require the jury to make such decision, thus leaving the jury with only an "all-or-nothing choice," the error would have been prejudicial under the decisional standard before the holding in *Breverman*, *supra*, 19 Cal.4th at pages 164-165. (See *Bradford*, *supra*, 14 Cal.4th at pp. 1056-1057; *Ramkeesoon*, *supra*, 39 Cal.3d at pp. 351-353.) In *Breverman*, our Supreme Court sent the matter back for consideration under this new standard of prejudice because the court of appeal there had reviewed the instructional error under the former standard that required the defendant's conviction be reversed "unless 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' [Citation.]" (*Breverman*, *supra*, 19 Cal.4th at pp. 164-165.)

A review of the entire record under the current *Breverman* standard (*Breverman*, 19 Cal.4th at pp. 165, 178) shows that although the prosecution evidence was conflicting on when Threats took Carly's purse, Threats himself testified he did not take the purse. Threats's counsel then argued the People had not met their burden of proof beyond a reasonable doubt to show that whoever took Carly's purse did so with the specific intent to deprive it from her while applying force or putting her in fear. Both counsel essentially stressed the element of the taking of the purse from Carly had to be accomplished by either force or fear to find the charged robbery and that the intent to permanently deprive her of the purse had to concur with such conduct. After being properly instructed on all the elements of the charged robbery, including the required specific intent and the necessity of concurrence of act and that specific intent, the jury found Threats guilty of robbing Carly. Under these circumstances, we do not believe it "reasonably probable" that Threats would have obtained a more favorable outcome had the jury been instructed with theft as an LIO of robbery. (*Breverman*, *supra*, 19 Cal.4th at p. 178.)

Contrary to Threats's position that the fact the jury requested a readback of Carly's and Estrada's testimony regarding the purse shows prejudice, such reveals the jury carefully reviewed the record to determine whether the element at issue, that the taking concurred with the force or fear, was sufficient to establish Threats's guilt of the charged robbery. If the jury had been properly instructed with the LIO of theft, it is likely on this record that the jury would have requested

09cv0816

1   the same portions of testimony and would have made the same determination.
2   (See *Breverman*, *supra*, 19 Cal.4th at p. 177.)   Accordingly, we can find no prejudicial, reversible error on this record in this regard.

3   (Lodgment No. 3 at 22-25.)

4       The Supreme Court has held that a federal court may not generally grant federal habeas

5   relief based on errors of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991) ("[I]t is not the

6   province of a federal habeas court to reexamine state court determinations on state law

7   questions.")   To merit federal habeas relief based on a state trial error, a petitioner must

8   demonstrate that the error "so infected the entire trial that the resulting conviction violates due

9   process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977), quoting <u>Cupp v. Naughten</u>, 414 U.S.

10   141, 147 (1973).  Additionally, when the trial court's failure to give an instruction is at issue, the

11   burden on a petitioner is "especially heavy." <u>Kibbe</u>, 431 U.S. at 154.  Furthermore, even if the

12   trial court erred, habeas relief is unavailable unless the error had a "substantial and injurious

13   effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 627.

14       While it is well-established that a trial court's failure to instruct on a lesser included

15   offense in a capital case would constitute a violation of due process, (see <u>Beck v. Alabama</u>, 447

16   U.S. 625, 637-38 (1980)), there is no "clearly established federal law" that requires a trial court

17   give an instruction on a lesser included offense in a non-capital case.  <u>See</u> <u>Turner v. Marshall</u>,

18   63 F.3d 807, 818-19 (9th Cir. 1995), <u>overruled on other grounds by</u> <u>Tolbert v. Page</u>, 182 F.3d

19   677, 685 (9th Cir. 1999).  However, "[a] criminal defendant is entitled to adequate instructions

20   on his or her theory of defense." <u>Bashor v. Risley</u>, 730 F.3d 1228, 1240; <u>see also</u> <u>Bradley v.</u>

21   <u>Duncan</u>, 315 F.3d 1091, 1099 (2002) (finding "state court's failure to correctly instruct the jury

22   on the defense may deprive the defendant of his due process right to present a defense"); <u>Solis</u>

23   <u>v. Garcia</u>, 219 F.3d 922, 929 (2000) (stating that "the refusal by a court to instruct a jury on

24   lesser included offenses, when those offenses are consistent with defendant's theory of the case,

25   may constitute a cognizable habeas claim . . . .").

26       In California, a trial judge must instruct a jury on lesser included offenses if they are

27   supported by substantial evidence, including defenses that are not inconsistent with the

28   defendant's theory of the case.  <u>See</u> <u>People v. Breverman</u>, 19 Cal. 4th 142, 148-29 (1998);

09cv0816

1  <u>People v. Montoya</u>, 7 Cal. 4th 1027, 1047 (1994).  In the instant case, the California Court of

2  Appeals found that, because there was evidence introduced at trial that would support an

3  instruction on theft as a lesser included offense to the charged robbery, the trial court erred in

4  failing to give a theft instruction at Petitioner's trial, but concluded that this error did not result

5  in prejudice to Petitioner.  (Lodgment No. 3 at 25.)  This Court finds that the state court was not

6  unreasonable in so concluding.  Petitioner's defense at trial was that "he denied taking the

7  victim's purse at all."  (Traverse at 8; RT 374.)  In <u>People v. Ramkeesoon</u>, 39 Cal. 3d 346, 351

8  (Cal. 1985), the state supreme court found prejudicial trial court error in failing to provide a jury

9  instruction on the lesser included offense of theft when defendant testified that he "had not

10  thought about stealing any of [the victim's] property until after the assault was completed."  <u>Id.</u>

11  In the instant case, the requested instruction on theft was not consistent with the defense theory

12  of the case, as the defendant's testimony was that he did not take the victim's purse at all.

13  Moreover, defense counsel's closing argument emphasized the testimony of the victim, who

14  stated that Petitioner initially told her he did not want the purse, and took the purse while fleeing,

15  arguing that "[i]f you feel that it didn't - - the purse wasn't taken by force or fear - - that's only

16  one of the elements.  Okay.  You can find all the other elements beyond a reasonable doubt.  It

17  doesn't matter - - would be a not guilty charge."  (RT 439-40.)  Here, the requested instruction

18  was not consistent with the defendant's testimony, and the absence of the instruction did not

19  violate clearly established federal law.  <u>See Solis</u>, 219 F.3d at 929; <u>Turner</u>, 63 F.3d at 818-19.

20  Additionally, the evidence introduced at trial was consistent with the jury's verdict.

21  While the victim testified that the defendant took the purse while fleeing and initially did not

22  appear interested in her purse, the testimony of Ricky Estrada supported a robbery conviction.

23  Mr. Estrada testified that when he arrived at the scene, Petitioner already had something that

24  looked like a purse on his shoulder while he was struggling with the victim and hitting her head

25  on the ground.  (RT 160-66.)  During deliberations, the appellate court noted that the jury

26  requested a readback of both the victim's and Mr. Estrada's testimony regarding the purse, and

27  reasoned that the jury evidently gave great consideration to the required elements of robbery.

28  (<u>See</u> Lodgment No. 3 at 25; RT 458-59.)

09cv0816

Moreover, the trial court's jury instructions included specific instructions directing that the application of force or fear had to be concurrent with the taking of the purse in order for the jury to return with a guilty verdict on the charged robbery.  (RT 439-40; RT 401, 409.)  The jury ultimately convicted Petitioner on the robbery charge, and in so doing, must have concluded that the use of force or fear was concurrent with the taking of the victim's purse.  Therefore, as the appellate court properly concluded, Petitioner fails to demonstrate that he was prejudiced by the absence of an instruction on theft.

Petitioner fails to demonstrate that the absence of a lesser included instruction on theft had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 627.  This Court cannot say the state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law. Williams, 529 U.S. at 412-13.  This Court recommends **DENYING** habeas relief as to Claim Three.

**2.       Trial Court's Refusal to Give Pinpoint Instruction on After-Acquired Intent**

In Claim Four, Petitioner asserts that his "conviction for robbery is unlawful because the trial court unconstitutionally deprived him of his right to instructions on the defense's theory of the case, specifically as to after-acquired intent."  (FAP at 13.)  Respondent notes that the appellate court found trial court error in the failure to provide this jury instruction, but concluded that the error was not prejudicial to Petitioner.  (Ans. Mem. at 15.)  Respondent contends that the absence of this instruction did not render Petitioner's trial fundamentally unfair, and does not require habeas relief.  (Id. at 16.)

Petitioner raised this claim in a habeas petition before the California Supreme Court, which denied his claim in an opinion stating in full, "[t]he petition for writ of habeas corpus is denied.  George, C.J., was absent and did not participate." (Lodgment No. 17.)  Therefore, the state appellate court issued the last reasoned decision on this claim and the Court must "look through" the silent denial of the state supreme court to the appellate opinion. Ylst, 501 U.S. at 806.  The California Court of Appeal rejected this claim on state habeas review, stating:

> Additionally, we noted that, although not raised as an error on appeal, the trial court erred in failing to give a pinpoint instruction on after-acquired intent for robbery.  Petitioner alleges in this petition that appellate counsel's failure to raise

this issue on appeal constitutes ineffective assistance of counsel. However, the same prejudice analysis we employed above applies here. As we concluded on direct appeal, we do not believe petitioner would have obtained a more favorable outcome had the jury been instructed with an after-acquired intent for robbery instruction. (*People v. Breverman* (1998) 19 Cal.4th 142, 178; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 360-361.)

(Lodgment No. 19 at 3.)

As stated in the discussion of Claim 3, a state trial error is not generally cognizable on federal habeas review unless the error "so infected the trial that the resulting conviction violates due process." Kibbe, 431 U.S. at 154, quoting Cupp, 414 U.S. at 147. Moreover, when the error at issue arises from a trial court's failure to give a jury instruction, the Supreme Court has held a petitioner's burden is "especially heavy." Kibbe, 431 U.S. at 154. Also as stated above, "[a] criminal defendant is entitled to adequate instructions on his or her theory of defense," Bashor, 730 F.3d at 1240, and the refusal to provide a requested instruction in that circumstance "may constitute a cognizable habeas claim." Solis, 219 F.3d at 929.

At trial, defense counsel requested a jury instruction "stating that robbery requires a showing of intent to steal before or during the application of force rather than merely after the application of force." (RT 393.) The trial court denied this request. (RT 394.) A general instruction on after-acquired intent would have read as follows:

> To constitute the crime of robbery, the perpetrator must have formed the specific intent to permanently deprive an owner of [his][her] property before or at the time that the act of taking the property occurred. If this intent was not formed until after the property was taken from the person or immediate presence of the victim, the crime of robbery has not been committed.

CALJIC 9.40.2 (2009).

As discussed above in the analysis of Claim Three, Petitioner testified at trial and denied taking the victim's purse.[3] Therefore, the requested defense instruction on after acquired intent was not consistent with the defense theory of the case. While the state appellate court concluded that the trial court's failure to instruct the jury on after acquired intent was error under state law,

---

[3] At one point, Petitioner's trial testimony included the following exchange:
"Q:    Is it your testimony that you did not take Carly Watson's purse?
A:     Yes, ma'am." (RT 374.)

09cv0816

Petitioner does not advance a claim upon which federal relief may be granted because the requested instructions was not necessary to his theory of defense.  See Bashor, 730 F.3d at 1240; Solis, 219 F.3d at 929.

Even assuming Petitioner has stated a federal claim, he has failed to demonstrate that the trial court's failure to provide an instruction on after-acquired intent had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 627.  This Court cannot say the state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law.  Williams, 529 U.S. at 412-13.  This Court recommends **DENYING** habeas relief as to Claim Four.

## C.     Claim Five- Cumulative Error

In Claim Five, Petitioner asserts that his "conviction for robbery is unlawful because the cumulative effect of the trial court's errors, as they pertain to the robbery count, denied him a fair trial." (FAP at 15.)  Respondent maintains that the absence of instructions on after-acquired intent and simple theft did not result in prejudice to Petitioner, and therefore Petitioner is not entitled to habeas relief on this claim.  (Ans. Mem. at 17.)

Petitioner raised this claim in a habeas petition before the California Supreme Court, which denied it in an opinion stating in full, "[t]he petition for writ of habeas corpus is denied.  George, C.J., was absent and did not participate." (Lodgment No. 17.)  Therefore, the Court must look through that opinion to the last reasoned decision on this claim.  See Ylst, 501 U.S. at 806.  On state habeas review, the state appellate court rejected Petitioner's claim of cumulative error, stating:

> Finally, because we have concluded that there is no prejudicial error in the jury instructions in petitioner's case, petitioner's claim of cumulative instructional error fails.  (*People v. Coryell* (2003) 100 Cal.App.4th 1299, 1309; *People v. Seaton* (2001) 26 Cal.4th 598, 639.)

(Lodgment No. 19 at 3.)

The Ninth Circuit has held that "the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error, considered individually would not require reversal."  Parle v. Runnels, 505 F.3d 922, 928 (9th Cir. 2007); see also Chambers v. Mississippi, 410 U.S. 284, 290 (1973).  "[T]he fundamental

09cv0816

question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, 93 S.Ct 1038, and thereby had a 'substantial and injurious effect or influence' on the jury's verdict, Brecht, 507 U.S. at 637, 113 S.Ct. 1710 (internal quotations omitted)." Parle, 505 F.3d at 928. Additionally, "[i]n those cases where the government's evidence is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).

Therefore, the Court must examine the combined effect of each error that occurred during Petitioner's trial. The state appellate court found that the trial court erred twice, in (1) failing to instruct the jury on the lesser included offense of simple theft, and (2) failing to give a pinpoint instruction on after-acquired intent for robbery, but concluded that those errors, whether taken alone or considered cumulatively, did not result in any prejudice to Petitioner.

Here, Petitioner fails to demonstrate a due process violation arising from the cumulative effect of these trial errors. As set forth above in the discussion of Claims Three and Four, neither state trial error rises to the level of federal constitutional error, and therefore Petitioner's claim is without merit. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) ("Because there is no single constitutional error in this case, there is nothing to accumulate . . .").

Moreover, even assuming the state trial errors could amount to federal constitutional error, this is not a case where the evidence against Petitioner was weak. The victim gave a description of her assailant on the night of the attack, including his attire of a white shirt and blue shorts, and identified Petitioner as her assailant that same evening. Estrada picked out Petitioner in a photo line up; in court, both individuals again identified Petitioner as the assailant. There was DNA evidence linking Petitioner to the victim. Estrada testified that when he came upon the scene, Petitioner, wearing a white shirt and blue shorts, was on top of the victim, who was "struggling to get away." (RT 129.) Estrada also stated that he then witnessed Petitioner shaking the victim, hitting her head on the pavement, and that Petitioner already had something on his shoulder at that time that "looked like a purse." (RT 130, 138.) Florio, who found the victim's purse in his garage, located around the corner from the scene of the attack, testified that

the night before finding the purse, he saw a man wearing a white shirt and blue shorts being chased by another man.  Petitioner testified that while his only contact with the victim was in front of the parking lot, he did not take the victim's purse and did not assault her, and claimed that she and Estrada were lying.  During his trial testimony, Petitioner also admitted that he initially lied to the police in telling them he had not had any contact at all with the victim.

Petitioner fails to demonstrate that the sum of any error "cumulatively produce[d] a trial setting that is fundamentally unfair."  Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir. 2003). Petitioner's claim of cumulative error must fail.  Accordingly, this Court concludes that the state court's rejection of Petitioner's cumulative error claim was not contrary to, nor an unreasonable application of, clearly established federal law.  Williams, 529 U.S. at 412-13.  Therefore, this Court recommends **DENYING** habeas relief as to Claim Five.

## V.    EVIDENTIARY HEARING

Petitioner states that "[a]n evidentiary hearing is necessary to resolve the Petitioner's claims.  The facts underlying the Petitioner's claims, by clear and convincing evidence, are all sufficient to show that but for the constitutional errors, no reasonable factfinder would have found the Petitioner guilty of the underlying offenses."  (Traverse at 9.)

Clearly established federal law generally dictates that when a federal habeas petitioner makes out a colorable claim, that is, "alleges facts which, if proved, would entitle him to relief," an evidentiary hearing is warranted.  Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992); see also Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005).  Here, Petitioner fails to demonstrate any colorable constitutional claim, and therefore does not merit an evidentiary hearing.  See id.  Additionally, because Petitioner's claims can be resolved on the basis of the state court record presently before the Court, an evidentiary hearing is not appropriate.  See Bashor, 733 F.2d at 1233 (an evidentiary hearing is not required on claims which can be resolved by a review of the evidence contained in the state court record).  Therefore, the Court recommends **DENYING** Petitioner's request for an evidentiary hearing.

///

09cv0816

## VI.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition and dismissing this action.

**IT IS ORDERED** that no later than **January 27, 2010**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 10, 2010.**  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  January 5, 2010

Hon. Anthony J. Battaglia
U.S. Magistrate Judge
United States District Court

27

09cv0816